

**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

# Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives

## Report Number I-2004-005

## July 2004

# EXECUTIVE DIGEST

The Office of the Inspector General (OIG) assessed the effectiveness of the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) program for inspecting Federal Firearms Licensees (FFLs) to ensure that they are complying with federal firearms laws and regulations. We reviewed the frequency and quality of the ATF's different types of FFL inspections; how the ATF manages its Inspector resources; how the ATF selects FFLs for inspection; and the regulatory enforcement actions taken by the ATF against FFLs who violate federal firearms laws.

The Gun Control Act of 1968 (Act) established the ATF's FFL inspection program "for ensuring compliance with the record keeping requirements" of the Act.[1] ATF Inspectors conduct "application inspections" on applicants for FFLs and "compliance inspections" on existing license-holders. Application inspections are conducted to ensure that applicants are familiar with the Gun Control Act and other federal firearms laws.[2] Compliance inspections are conducted to ensure that FFLs are obeying these laws. Specifically, FFLs must account for all firearms that they have bought and sold, and report all multiple handgun sales and firearms thefts to the ATF. If the ATF finds violations, it is empowered to take adverse actions including issuing warning letters, directing FFLs to attend warning conferences, revoking the FFLs' licenses, and, potentially, referring the matter to ATF Special Agents for criminal enforcement. As of March 2004, the ATF had limited authority to suspend an FFL's license, and no authority to fine FFLs.

## RESULTS IN BRIEF

We found that the ATF's inspection program is not fully effective for ensuring that FFLs comply with federal firearms laws because inspections are infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic. Specifically, the ATF does not conduct in-person inspections on all applicants before licensing them to sell guns, and ATF compliance inspections of active dealers, including large-scale retailers, are infrequent and vary in quality. Even when numerous or serious violations were found, the ATF did not uniformly take adverse actions, refer FFLs for investigation, or conduct timely follow-up inspections.

---

[1] The Gun Control Act of 1968, Public Law 90-618. Title 18 U.S.C. Chapter 44.

[2] The National Firearms Act, Title 26 U.S.C. Chapter 53; The Arms Export Control Act of 1976, Title 22 U.S.C. § 2778.

---

U.S. Department of Justice     i
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 2 of 14 PageID #: 257

We also found wide variations in the ATF inspection program's productivity and implementation among the ATF Field Divisions that led us to conclude that inspection procedures should be streamlined and standardized. Although the ATF faces significant shortfalls in resources, it must ensure that available Inspector resources are used effectively and efficiently to ensure that FFLs comply with federal firearms laws. The ATF has begun to implement changes to improve the consistency with which it conducts follow-up inspections and takes adverse actions. However, our review concluded that the ATF still needs to implement consistent inspection procedures to identify and address problem FFLs.

**The ATF Does Not Conduct In-Person Application Inspections on All New FFLs to Verify Applicant Information and Ensure They Understand Firearms Laws**

Application inspections are critical for ensuring compliance with federal firearms laws. These inspections enable the ATF to verify that applicants are eligible for federal firearms licenses and also provide the new dealers an opportunity to discuss issues related to firearms laws with ATF Inspectors. Further, if an FFL violates federal firearms laws after having received an application inspection, it is easier for the ATF to meet the legal standard of demonstrating that the violation was "willful."[3]

In fiscal year (FY) 2002, the ATF issued 7,977 licenses to new firearms businesses and 7,382 licenses to firearms collectors, and conducted 8,123 application inspections.[4] Upon examining the ATF's firearms license database, we found that most (95 percent) of the inspections were of businesses, not collectors, which indicated that the ATF inspected the preponderance of new firearms retailers in FY 2002. However, our interviews and survey of ATF Headquarters and Field Division personnel found that many of those application inspections consisted only of a telephone call rather than an in-person visit. ATF Headquarters and Field Division staff told us that telephonic application inspections were not as comprehensive as in-person inspections, but the ATF staff said that they did not have enough resources to conduct all

---

[3] In the context of the Gun Control Act, willfulness is the intentional disregard of, or indifference to, legal obligations. Repeat violations (especially where there was notification of prior violations) or large numbers of violations can demonstrate willfulness. Sometimes one egregious violation, such as selling a gun to a non-prohibited person when the FFL knows that the gun is actually for a prohibited person ("straw purchase"), can demonstrate willfulness.

[4] A collector's license enables individuals to make interstate sales and purchases of firearms classified by the ATF as curios and relics to facilitate a personal firearms collection. ATF officials told us that they do not place a high priority on inspecting new firearms collectors.

U.S. Department of Justice                                                                    ii
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 3 of 14 PageID #: 258

inspections in person. Subsequent to the initiation of this review, in an October 8, 2003, memorandum to ATF Field Divisions, the ATF Assistant Director for Firearms, Explosives, and Arson issued revised guidance for conducting application inspections. The memorandum stated that the ATF's goal is to inspect all new FFL applicants on-site to ensure that they understand federal firearms laws before issuing them a federal firearms license, beginning with applicants in 14 selected cities. Although the new guidance is a step in the right direction, the ATF still does not comprehensively inspect all new applicants in person.

**The ATF Does Not Regularly Conduct Compliance Inspections on Active FFLs, Including Large-Scale Retailers**

We found that most FFLs are inspected infrequently or not at all. According to the former ATF Director, the agency's goal is to inspect each FFL at least once every three years to ensure that they are complying with federal firearms laws. However, due in part to resource shortfalls, the ATF is currently unable to achieve that goal. ATF workload data show that the ATF conducted 4,581 FFL compliance inspections in FY 2002, or about 4.5 percent of the approximately 104,000 FFLs nationwide. At that rate, it would take the ATF more than 22 years to inspect all FFLs.

Our review of the inspection history for 100 randomly selected FFLs also showed that the ATF did not conduct regular compliance inspections. Of the 100 FFLs, 23 had never been inspected; 22 had received only an application inspection; 29 had received at least one compliance inspection; and 26 FFLs had received only a license renewal inspection. Even for those FFLs that had been inspected, the records showed that many of the inspections occurred years ago. For example, one FFL cited in 1985 for selling a rifle to a minor and for numerous record-keeping violations had never been re-inspected.

**The ATF Does Not Identify and Inspect All FFLs that Exhibit Established Indicators of Potential Violations or Gun Trafficking**

"Crime gun" trace data enables the ATF to identify FFLs that may be violating federal firearms laws or FFLs at which firearms trafficking may be occurring.[5] Although the ATF focuses its inspections on those FFLs that exhibit most severely the established indicators of trafficking

---

[5] The ATF defines a "crime gun" as any firearm that is "illegally possessed, used in a crime, or suspected by law enforcement officials" of having been used during the commission of a crime. The ATF National Tracing Center traces crime guns recovered by law enforcement agencies to determine where they were originally sold by an FFL.

U.S. Department of Justice                                                        iii
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030  Document 32-1  Filed 08/21/09  Page 4 of 14 PageID #: 259

(e.g., sales of many handguns to one person), it does not identify all FFLs that exhibit those indicators. Instead, the ATF manipulates the criteria it uses to target FFLs for inspections so that it only identifies as many such FFLs as it has the resources to inspect. Therefore, the ATF has not applied its established indicators of potential trafficking to objectively identify the full universe of potential traffickers.

In December 2003, the ATF began a special project to identify common characteristics of FFLs that pose a greater risk to public safety, so that the general level of compliance within the industry can be estimated and that compliance inspections can be better directed at those FFLs where it is most likely that violations may have occurred. Nonetheless, until the ATF objectively identifies the full universe of FFLs that exhibit established trafficking characteristics, it cannot identify the resources it needs to effectively address FFLs that are likely to be committing violations, or accurately report to the Attorney General, Congress, and the public on the scope of the potential trafficking problem at FFLs.

## Implementation of FFL Inspections by Field Divisions Is Inconsistent

The conduct of FFL inspections varied greatly among the ATF Field Divisions. The average time that each of the 23 ATF Field Divisions spent conducting each application inspection in FY 2002 ranged from 6.2 hours per inspection to as much as 25.5 hours per inspection. The average time spent to conduct each compliance inspection ranged from 24.5 hours to as much as 90 hours per inspection. ATF Headquarters officials stated that the variance in average inspection times among the 23 Field Divisions occurred because of the discretion that Inspectors have in conducting compliance inspections and because some Field Divisions had more inexperienced Inspectors on staff, which reduced productivity.

We reviewed the ATF's guidance for inspections and found that it does allow Inspectors great latitude to modify significant portions of the inspections. For example:

- To determine whether an FFL's record-keeping system is accurate, ATF Inspectors may either conduct a full inventory during a compliance inspection or sample the FFL's inventory. The ATF inventory worksheet used during inspections provides no guidance to ensure that a minimum valid sample is taken.

U.S. Department of Justice                                      iv
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 5 of 14 PageID #: 260

- The ATF worksheet for examining sales records does not specify how many records to review. Our interviews with Inspectors in Field Divisions found varying approaches. For example, in the Miami Field Division, Inspectors said that they reviewed six months of records, while Inspectors at the Seattle Field Division said that they examined the records for one year. The Inspectors also examined the records differently. Of the 18 Inspectors we interviewed, 14 said that they only examine the forms to see if they were properly filled out, while 4 indicated that they also look for indications that a purchaser may be part of a firearms trafficking ring or acting as a straw purchaser for someone else.

We also examined the numbers of inexperienced Inspectors on staff and compared the percentage of inexperienced staff to the average inspection times for each Field Division, but we found no correlation. Rather, our review of application inspection data found that average inspection times were related to disparities in staffing levels and the number of FFLs located in the Divisions. Field Division Inspector staff ranged from a high of 35 Inspectors to a low of 9 Inspectors. Likewise, the number of FFLs in each Field Division ranged from 1,172 to 8,194. However, the ATF had not distributed its Inspector resources among the Field Divisions to match the distribution of FFLs, resulting in significant workload imbalances. As a result, the average time that each Field Division spent on application inspections decreased as the number of FFLs per available Inspector increased.

We also examined several performance indicators to see if the inspection variations had an impact on outcomes, such as violations found and criminal referrals. We found little correlation between the amount of time that Field Divisions spent inspecting and the number of adverse actions (such as revoking an FFL's license) that the Field Divisions took or the number of times the Field Divisions identified and referred suspected criminal activity for investigation. We also found significant variances in productivity among the ATF Field Divisions' inspections. For example, our analysis of the ATF's FY 2002 workload and performance data found:

- The number of inspections conducted per Inspector each year ranged from 12.7 (Miami Field Division) to 46.5 (Kansas City Field Division).

- The percentage of the inspections conducted by Field Divisions that identified violations varied from just 4.5 percent (Kansas City Field Division) to 41.5 percent (Dallas Field Division).

U.S. Department of Justice                                                    v
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 6 of 14 PageID #: 261

- On compliance inspections in which violations were discovered, the average number of violation instances found ranged from 15.9 (Nashville Field Division) to 178.2 (Chicago Field Division).

- The average time that the Field Divisions took to find each violation instance ranged from 47 minutes per violation instance (Dallas Field Division) to over 7 hours per violation instance (Los Angeles Field Division).

Our review of FFL inspection files also found that even when FFL compliance inspections identify significant violations of federal firearms laws by the FFLs or by gun purchasers, these violations are not always reported to ATF Special Agents for investigation. We identified several cases in which indications of potential criminal violations, including gun trafficking, were identified but not referred for investigation. The FFLs were subsequently investigated after the illegal activity was discovered through other means. For example, one FFL was inspected in October 2002, and during that compliance inspection the Inspector found 40 firearms not entered into the FFL's inventory records, missing sales records, and sales to out-of-state residents – all strong indicators of gun trafficking. However, the Inspector did not report the findings through ATF management channels to ATF Special Agents for investigation. Subsequent to the inspection, information from a confidential informant led to an investigation, and in December 2003, ATF Special Agents arrested the dealer for firearms trafficking.

**The ATF Acts Infrequently to Revoke Federal Firearms Licenses, and the Process is Not Timely**

In FY 2002, 1,934 of the inspections that the ATF conducted uncovered violations. Inspectors found an average of almost 70 violations on each of these 1,934 inspections. In FY 2003, the ATF found violations on 1,812 inspections, with an average of over 80 violations each. However, the ATF issued only 30 Notices of Revocation in FY 2002 and 54 Notices of Revocation in FY 2003. In addition to initiating few revocation actions, the process for revoking the licenses of FFLs that violated federal firearms laws, or clearing the FFL, is lengthy.[6] The ATF provided us with case-tracking data for 50 closed denial and revocation cases completed in FY 2001 and FY 2002. We determined that the

---

[6] Notices of Revocation are not final. Of the 30 Notices in FY 2002, 25 FFLs requested a hearing and 3 of those avoided revocation. (FY 2003 data was unavailable.) The ATF also can effectively revoke an FFL's license by denying his or her request for license renewal, and in FY 2001, the ATF denied 28 requests for renewal.

U.S. Department of Justice                                                  vi
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 7 of 14 PageID #: 262

processing of these 50 cases averaged 379 days from the date that the Inspector recommended revocation to the date that the case was closed.

According to ATF officials, the lengthy duration of revocation proceedings was due to the number of ATF officials involved in the eight-step process (e.g., Area Supervisors, Directors of Industry Operations (DIOs), Division Counsels, and Hearing Officers) and delayed support from ATF lawyers. The ATF's case tracking data did not include internal tracking dates, but Assistant Chief Counsels and Division Counsels we interviewed acknowledged delays in denial and revocation proceedings. They stated that the delays were due, in part, to their heavy caseloads and a need for better documentation of violations from ATF Inspectors. We also noted that, in some cases, delays occurred due to a lack of legal staff within the Field Division. Some Field Divisions without staff lawyers were required to obtain support directly from their regional Assistant Chief Counsel's Office.[7]

In May 2003, subsequent to the initiation of our review, the ATF issued guidelines to ensure more consistent and timely initiation and processing of adverse actions. We found that, after the ATF issued the guidelines, the number of FFL revocation hearings rose from 25 in FY 2002 to 87 in FY 2003. The ATF also denied FFL requests to renew their licenses or issued Notices of Revocation 59 times during the first quarter of FY 2004. Most of these cases had yet to be finalized as of March 2004.

The May 2003 guidelines begin to address the problems that we noted with the ATF's past failure to consistently follow up and take action when violations are found. Specifically, the policy directs that all FFLs that were issued warning letters or that were directed to attend warning conferences must be scheduled for a follow-up "recall" inspection in the following year, and that adverse actions are to escalate for repeat offenses. The policy also establishes a time frame for part of the adverse action process by directing Field Divisions to act on recommendations for adverse action within 90 days after receiving the inspection report.

---

[7] The ATF has five Assistant Chief Counsel Offices, located in San Francisco, Chicago, Dallas, Atlanta, and New York/Philadelphia. The northeast regional office is currently operating in Philadelphia due to the September 11, 2001, destruction of the ATF's New York offices, which were located at the World Trade Center.

U.S. Department of Justice                                                         vii
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 8 of 14 PageID #: 263

**FFL Inspections Must Be Streamlined and Standardized**

With the May 2003 guidelines, the ATF began to improve the consistency and timeliness of adverse actions (including warning letters, warning conferences, and revocation), but the ATF needs to further improve the consistency and quality of FFL inspections. The current variability in the Field Divisions' inspection implementation must be addressed to ensure that FFLs subject to adverse actions are treated consistently. Requiring specific adverse actions for specific numbers of violations in the absence of standardized inspection procedures and sampling criteria will result in dissimilar treatment of FFLs in different Field Divisions. As discussed previously, the ATF's guidance on conducting inspections does not ensure consistent examinations of FFLs' compliance with gun laws.

Areas in which the inspection process could be improved include: standardizing procedures to require reviews of firearms inventories and sales records to establish a statistically valid sample needed to verify the effectiveness of the FFL's inventory management and record-keeping systems; standardizing and automating inspections paperwork and providing laptop computers to enable Inspectors to prepare reports on-site; extending the inspection cycle for FFLs with no significant violations so that limited resources can be directed toward noncompliant dealers; and establishing guidance to ensure that Inspectors consistently identify and report indications of firearms trafficking for investigation.

Improving the efficiency of the inspection process through standardization also could reduce the need for additional staff and the time spent at FFLs. In an April 2003 report to Congress, the former ATF Director stated that to fully implement the ATF's mission to enforce federal firearms laws, the ATF would need 1,235 Inspectors dedicated to conducting FFL inspections.[8] That projection appears to include an assumed 27 percent increase in the average length of inspections over the historical average of 49.4 hours that we identified.[9] If the staffing requirement was calculated using the ATF's actual historical inspection average of about 50 hours, the ATF would need a total of only 984 Inspectors to accomplish firearms inspections on a triennial basis. Moreover, rather than increasing inspection times, our analysis shows

---

[8] On March 24, 2004, the current Acting ATF Director reiterated the report's figures in testimony before the House Committee on Appropriations, Subcommittee on Commerce, Justice, and State, the Judiciary, and Related Agencies.

[9] This average includes both application and compliance inspections, as well as all other time (e.g., leave, training, etc.) that must be considered when projecting staffing needs.

U.S. Department of Justice                                                          viii
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 9 of 14 PageID #: 264

that implementing a streamlined yet statistically valid inspection regimen could reduce the average inspection time and the ATF could therefore reduce the number of additional Inspectors needed to accomplish FFL compliance inspections every three years. For example, by reducing the average inspection time to 40 hours, the ATF would reduce the number of Inspectors needed to conduct FFL compliance inspections on a triennial basis from 1,235 to 788 Inspectors.

Increasing the efficiency of the inspection process also is needed because the demand on ATF Inspectors to perform duties related to explosives is increasing. In November 2002, the Safe Explosives Act imposed new requirements that increased the number of explosives licensees and directed the ATF to conduct on-site inspections of explosives licensees at least once every three years. The additional explosives workload already has reduced the ATF's ability to inspect FFLs. Our review of inspections data for the first five months of FY 2004 found a precipitous decrease in the number of compliance inspections. From October 2003 through February 2004, the ATF completed just 1,113 FFL compliance inspections. At that pace, the ATF would complete fewer than 2,700 FFL compliance inspections during FY 2004 – less than half the number that the agency reported that it completed in FY 2003 and less than 2.6 percent of the FFL population.

**The ATF Does Not Consistently Report Inspection Performance**

In response to our requests for inspections and workload data, the ATF queried its N-Spect, Federal Licensing System (FLS), and Standard Time and Attendance System (STATS) electronic databases.[10] During our examination of the performance and productivity of the ATF's FFL inspections program, we identified significant discrepancies between the systems with regard to the number and type of inspections conducted and the hours spent conducting the inspections. Further, we found that data contained in the N-Spect database contained significant errors. For example, while preparing responses to our data requests, ATF officials determined that several hundred inspections entered as compliance inspections were actually application inspections. In addition, the data in the systems differed significantly from the data the ATF included in published reports. We discussed these inconsistencies with ATF Headquarters officials, and they gave two reasons for the inconsistencies. They stated that there were differences in how the queries of the N-Spect electronic database were constructed by different ATF analysts, and that

---

[10] N-Spect tracks direct time related to FFL inspections, FLS tracks information related to FFL licensees, and the STATS timekeeping system tracks direct and indirect hours for payroll purposes.

U.S. Department of Justice                                                ix
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 10 of 14 PageID #: 265

Field Division staff did not use the correct project codes because the codes are "confusing."

To improve the future tracking of inspection data, in October 2003 the ATF implemented a new version of N-Spect that requires Field Division staff to use pull-down menus that are inspection-specific (e.g., "Application Inspection"). Although the enhancements to the N-Spect database will increase the reliability of the data in the system, the ATF must nonetheless adopt a standard approach for querying the N-Spect electronic database to ensure that requests for the same data will elicit comparable results. If the ATF does not adopt a standard method for querying and extracting historical data, it cannot consistently report accurate performance data.

**New Restriction on Retention of Gun Purchaser Data Will Reduce the ATF's Ability to Detect Fraudulent Background Checks**

Prior to selling a gun, an FFL must determine if the potential purchaser is prohibited from owning a gun by querying the Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS) directly through the FBI or through a designated state agency. For each query, the FBI's NICS currently retains for 90 days whether or not the sale was approved and information on the purchaser. However, beginning in July 2004 all purchaser information on NICS queries that do not result in a denial will no longer be kept for 90 days, but will be destroyed within 24 hours of the official NICS response to the FFL.[11] To comply with this requirement, the FBI has stated that it intends to expunge purchaser information for approved sales from NICS records overnight. For these approved sales, the FBI will retain for 90 days only the NICS Transaction Number (NTN), the license number of the FFL that contacted NICS, and the date that the NICS query was made. After 90 days, the FBI will retain only the NTN and the date that the number was issued.

For most FFLs, NICS is a valuable tool that enables them to quickly determine whether a potential customer is prohibited from buying firearms. However, a small number of corrupt gun dealers may attempt to hide transfers to prohibited persons by falsifying NICS information, such as by listing the prohibited buyer on the sales record but calling in to the FBI the name of a person with a clean record.

---

[11] The Fiscal Year 2004 Consolidated Appropriations Bill (Public Law 108-199) states that the Department of Justice cannot retain "identifying information" related to sales of firearms to non-prohibited persons for more than 24 hours. However, all information related to calls for which potential sales are *denied* by NICS will be retained indefinitely.

U.S. Department of Justice                                                    x
Office of the Inspector General
Evaluation and Inspections Division

Currently, the ATF rechecks recent sales records with NICS to verify the information that the FFLs submitted. The ATF reported that it has not found any NICS violations involving the falsification of purchaser information through these reviews, but officials said the checks serve as a deterrent. However, the reduced retention period for approved purchaser and FFL information will limit the ATF's ability to detect certain fraudulent NICS checks through FFL inspections, since the ATF will no longer be able to verify the information that the dealers submitted by rechecking sales records at the FFL.

## CONCLUSIONS

Our review found the ATF's FFL inspection program is too limited and inconsistent to ensure that FFLs comply with federal firearms laws. In FY 2002, the ATF inspected only 4.5 percent of the approximately 104,000 FFLs to ensure they were complying with federal firearms laws. Although we recognize that the ATF's resources are limited, we concluded that the ATF's lack of standardized inspection procedures results in inconsistent inspections of FFLs and significant variation in the implementation of the inspection program by Field Divisions. The most recent performance data available show that ATF's Field Divisions took from 24.5 hours to as much as 90 hours per compliance inspection. Further, we found little or no correlation between longer inspection times and outcomes such as criminal referrals and adverse actions taken. We concluded that the ATF needs a more standardized and efficient inspection regimen.

Because the ATF does not conduct regular inspections of all FFLs, it cannot effectively monitor the overall level of FFL compliance with federal firearms laws. In December 2003, the ATF directed Field Divisions to conduct Random Sample Compliance Inspections. Using data from those inspections, the ATF planned to "be able to project the overall level of compliance by" gun dealers, pawnbrokers, and collectors.[12] While the project to estimate the overall level of compliance with laws is needed to assess the challenge facing the ATF, it cannot take the place of regular compliance inspections for deterring and identifying noncompliance with gun laws.

To ensure that all FFLs are treated consistently, and that the FFL inspection program is as efficient as possible to maximize the number of inspections conducted annually, a national ATF policy should require

---

[12] Memorandum, Assistant Director for Firearms, Explosives, and Arson to All Special Agents In Charge, December 8, 2003. ATF officials told us that the memorandum was not distributed to the Field Divisions until January 2004.

U.S. Department of Justice                                                                    xi
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 12 of 14 PageID #: 267

that inspections be conducted in a uniform manner, that inspections procedures are limited to the steps needed to accomplish a valid review, and that violations are processed in a uniform and appropriate manner. A consistent and timely inspection process is essential for identifying and addressing scofflaw dealers and for reducing the availability of illegal firearms to criminals.

## RECOMMENDATIONS

We recommend that the ATF:

1. Develop a standard, streamlined inspection process that includes in-person inspections of all FFL applicants; more efficient inventory and records reviews; automated inspection reporting; and consistent examination of indicators of firearms trafficking.

2. Conduct a pilot project to test the streamlined inspection procedures and establish appropriate time standards for conducting these inspections.

3. Revise the staffing requirement report using the time standards to reflect the number of Inspectors needed to conduct compliance inspections on a triennial basis, or on an alternative schedule based on the FFL's compliance history.

4. Develop alternatives for better aligning Inspector resources with the distribution of FFLs, such as by redrawing Field Division boundaries, realigning personnel, or other methods.

5. Update the inspection tracking system to accurately segregate and report on Inspector time spent preparing for inspections, in travel, on-site at FFLs, and conducting other administrative duties.

6. Prepare quarterly reports on the productivity and results achieved by each Field Division.

7. Direct the National Licensing Center to develop an adverse action tracking system to monitor the progress and timeliness of FFL denials and revocations from the time an Inspector makes a recommendation until the proceedings are finalized.

U.S. Department of Justice                                                                          xii
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 13 of 14 PageID #: 268

8. Continue coordinating with the Department of Justice, Office of Legislative Affairs, to gain the authority to suspend or impose civil penalties on FFLs that violate federal firearms laws.

9. To improve the comprehensiveness of crime gun tracing by law enforcement agencies:

   a. Coordinate with the Office of Justice Programs to determine the feasibility of using discretionary grant funding to support crime gun tracing.

   b. Develop a model for more accurately identifying potential firearms trafficking through the analysis of an FFL's firearms sales volume and the number of firearms traced to the FFL.

U.S. Department of Justice                                                                 xiii
Office of the Inspector General
Evaluation and Inspections Division

Case 1:09-cv-00030   Document 32-1   Filed 08/21/09   Page 14 of 14 PageID #: 269